1                    UNITED STATES DISTRICT COURT

2                          DISTRICT OF UTAH

3                                -o0o-

4

5    UNITED STATES OF AMERICA,      )
                                    )    Case No. 2:22-cr-000210-TC
6          Plaintiff,               )
                                    )
7    v.                             )
                                    )
8    DANIEL DAVID EGLI,             )
                                    )
9          Defendant.               )
     _____)

10

11

12              BEFORE THE HONORABLE TENA CAMPBELL

13                                ---

14                    Thursday, August 7, 2025

15                    1:32 p.m. to 2:32 p.m.

16                         Sentencing and

17      Final Hearing on Revocation of Supervised Release

18                                ---

19

20

21

22

23

24   Reported by:  Michelle Mallonee, RPR, CCR  (801) 209-4979
     351 S. West Temple, #7.130, Salt Lake City, Utah 84101
25

                                                              1

1                          APPEARANCES

2

3    For Plaintiff:

4            CAROL A. DAIN, ESQ.
             UTAH ATTORNEY GENERAL'S OFFICE
5            160 East 300 South, 5th Floor
             Salt Lake City, Utah 84114
6            (801) 366-0353
             carol.dain@usdoj.gov

7

8    For Defendant:

9            DANIEL DAVID EGLI, PRO SE

10

11   Standby Counsel:

12           ROBERT L. STEELE, ESQ.
             FEDERAL PUBLIC DEFENDER, DISTRICT OF UTAH
13           46 W. Broadway, Suite 110
             Salt Lake City, Utah 84101
14           (801) 524-4010
             robert_steele@fd.org

15

16                          *  *  *

17

18

19

20

21

22

23

24

25

                                                           2

1          Thursday, August 7, 2025; Salt Lake City, Utah

2                            1:32 p.m.

3                              -o0o-

4          THE COURT:  All right.  We are here in the United

5    States versus Daniel David Egli.  Mr. Egli is here.  With

6    him is counsel, Mr. Bob Steele, who first was in this case

7    as standby counsel and then has played a fairly active role

8    during the post-trial proceedings.

9          First of all, I just received -- not "just," but

10   today, two motions filed by Mr. Egli.  The first one was the

11   objection to the sentencing and the motion to continue.

12   Mr. Egli contends and argues that a continuance is warranted

13   because of the government's sentencing memorandum not being

14   filed until August 1st of this year.  And according to

15   Mr. Egli, that gives him insufficient time to review that

16   memorandum.  And that is denied.  There is no necessity in

17   sentencing procedures for the government to file a

18   memorandum; and therefore, the claimed six days being too

19   short a period of time does not merit a continuance.

20         There is also a motion to remove appellate

21   counsel, which I must say, Mr. Egli, I don't quite

22   understand because we're not at the appeal stage.  As far as

23   Mr. Steele assisting you as standby, he has been a very

24   active and helpful counsel during these post-trial

25   proceedings.  And I am going to allow him to speak, if he

                                                          3

1    wishes, during the sentencing, and certainly you will be

2    allowed to speak, as well, so you will suffer no prejudice.

3           All right.  First of all, Mr. Steele, I know you

4    have because I've received your proceedings, but have you

5    had enough time to go over the presentence report with your

6    client?

7           MR. STEELE:  Your Honor -- and he may disagree

8    with me -- but we reviewed the initial presentence report.

9    And yesterday and today, I spent time with him and reviewed.

10   There really was only one change with the presentence

11   report.  So I would say we had enough time to do that.

12          THE COURT:  What was that change?  Please remind

13   me, sir.

14          MR. STEELE:  Well, Your Honor, I looked at what

15   was put in the presentence report concerning risk -- the

16   risk it represents.  And I suggested quite a bit be dropped

17   in.  And I'm okay with the shorter piece that was put in

18   there as being descriptive of and explanatory of the larger

19   thing I was asking for.  So I'm okay with that.

20          THE COURT:  All right.  Thank you.

21          And Ms. Dain, same question for you.

22          MS. DAIN:  We're prepared to proceed, Your Honor,

23   with the PSR as submitted.

24          THE COURT:  All right.  Did you have an objection,

25   Mr. Egli, to the PSR, sir?  Okay, you have to stand up when

                                                              4

1   you speak, sir.

2          DEFENDANT EGLI:  The only objection I had was

3   mentioned by Mr. Steele.  I would have preferred a much

4   longer detailed explanation than what the prosecution put

5   in, but it is what it is.

6          THE COURT:  All right.  Okay.

7          Looking at the guideline range -- and mind you,

8   they are advisory -- the advisory guideline range is 168

9   months to 210.

10          Ms. Dain, do you agree?

11          MS. DAIN:  We do, Your Honor.

12          THE COURT:  What about you, Mr. Steele?

13          MR. STEELE:  I do, Your Honor.

14          THE COURT:  Okay.  Tell me, Ms. Dain -- and I have

15   read everything that has been submitted to me.  Tell me,

16   Ms. Dain, what do you believe is a reasonable sentence?  If

17   you would come to the podium.

18          MS. DAIN:  Thank you, Your Honor.  I have also

19   reviewed Ms. Behrens's filing, which is seeking the

20   240-month sentence, which is the statutory maximum for the

21   count of conviction in addition to the two years of

22   supervision or supervised release available to the Court for

23   sentencing.  I believe the guidelines recommend that those

24   run consecutive when you're imposing sentence in concurrence

25   with an underlying -- or with another offense.

                                                        5

1          THE COURT:  In fact, I think isn't it required by

2    law that I have to run the supervised release sentence

3    concurrent?

4          MS. DAIN:  I think the guidelines suggest

5    consecutive, Your Honor.

6          THE COURT:  Consecutive.  Isn't that mandatory

7    that I do so?

8          MS. DAIN:  In Chapter 7, Your Honor, where I

9    believe that's found, I have always understood that to be a

10   recommendation.

11         THE COURT:  All right.

12         MS. DAIN:  But I could be wrong about that.

13         MR. STEELE:  Yeah, it's a recommendation.

14         MS. DAIN:  I think it's just a recommendation.

15   But -- because I certainly am aware that there are other

16   instances when courts have done some kind of half and half

17   or run them concurrent.  So -- but the suggestion is

18   certainly for -- outlined as consecutive.

19         This Court has -- this is a longstanding case,

20   Your Honor.  We've been here since 2004.  It started, I

21   believe, with Ms. Fojtik and continued on.  And after she

22   retired, we are here again on the third count of conviction

23   and, as outlined in both the presentence report and in the

24   sentencing memorandum, multiple violations in the interim,

25   some of which I think look like they could have risen to the

                                                        6

1    level of new charges as well.

2                THE COURT:  Right.

3                MS. DAIN:  So I think -- I don't need to, unless

4    the Court wants me to rehash -- I think I agree certainly

5    with everything Ms. Behrens has outlined, and persuasively.

6    This is an interesting case, and I really appreciate that

7    she subbed in some of the Tenth Circuit's language, because

8    I think it's critical in this case.

9                This is a fairly unique case in the sense that

10   we're here on conviction number three and, again, with the

11   multiple violations in the interim.

12               I believe -- this is strong words, and I know

13   this -- but I think incapacitation is the only way to keep

14   the community safe from Mr. Egli.  He -- and this is more

15   than just internet crimes.  He is actively seeking

16   relationships with individuals who either have minor --

17   access to minors or are alleged to be engaged in that

18   behavior.  He espouses beliefs that he should live on an

19   island where he can actively molest children and that that

20   should be normal and okay.

21               So this is more, even though the conviction is

22   clearly -- the behavior is for downloading images, there is

23   just so much more to the mentality and the background of

24   Mr. Egli that warrants a very substantial sentence that will

25   effectively, 100 percent keep this community safe.

1          As the Court is aware from the testimony and in
2     the filings, he's taking action to subterfuge probation, his
3     therapists.  Every avenue that's been put forth in front of
4     him to do better, to improve, to make changes, he is
5     persistently taking steps to avoid detection of his bad
6     behavior.  And he continues.  And those are contemplative
7     choices.  That is not something that's just sort of
8     happening.

9          I appreciate the diagnosis of autism.  I would
10    just offer to the Court a couple things with regard to that.
11    There are many, many functioning people in society with some
12    version of autism that are not seeking out, looking for,
13    hoping to molest children.  And I can't -- again, I
14    understand there's some conjunction with brain function and
15    things like that.  But if there are people who are able to
16    do it, that means this is an exception that Mr. Egli is out,
17    and it makes him, quite frankly, dangerous.  Because if that
18    is the explanation of why he's doing what he's doing, again,
19    it urges me to ask this Court to incapacitate the defendant.
20    Because if he can't be changed because of a mental
21    diagnosis, then he is extremely dangerous to the community.

22         I believe I'll just quickly address -- I
23    appreciate Mr. Steele pointed out there have been arguments
24    against the guidelines in this.  Irrespective, this Court is
25    able to find the guidelines as applied, or can vary if, for

8

1   example, you don't have a computer.  But I think Mr. Egli

2   has shown he has these things in writing and computer, and

3   so his crime actually is elevated because of the use of the

4   computer, and I think more substantially in this case

5   because Your Honor actually told him he may not use a

6   computer at all.

7          So it's a layer on top of a layer of violations of

8   court orders and the law that got us here.  So I think it is

9   pertinent in this case that the plus two would apply for

10  using a computer.

11         But irrespective of what those guidelines -- if

12  the Court were to vary down, it doesn't change the United

13  States' request for a 240-month sentence plus the additional

14  two years for violation for the supervised release

15  violation.

16         So the history is here, Your Honor.  This is

17  unique in the sense that we're at year 21.  I'm glad in a

18  way that Your Honor has heard this whole -- you've been

19  through the history of this defendant and the charges and

20  where we're at and all the violations in the interim.

21         And again, I don't know that there's a lot else to

22  say, other than the United States strongly believes

23  Mr. Egli, if -- at whatever point, even when he's aging, in

24  22 years from now is still a danger to the community.  And

25  the longer we can keep him away from computers and access to

9

1   children, that would be a safer community.

2          I don't really have a lot more unless the Court

3   has questions.

4          THE COURT:  No.  I thank you, Ms. Dain.

5          MS. DAIN:  Thank you.

6          THE COURT:  Mr. Steele.  And I have a question to

7   ask counsel.

8          We are here for sentencing in two matters, as I

9   think we are all aware:  The trial, which was held in

10  October, 22-cr-00210; and then the supervised release,

11  10-cr-00333, which had three allegations.

12         It appeared to me, but I'd like to know your

13  beliefs on it, those three allegations of violation, it is

14  my belief that those allegations were really encompassed in

15  what was heard during trial and during the various motions

16  leading up to trial.  In fact, I think that Mr. Egli himself

17  has admitted that he had access to a laptop.  And the jury

18  found that Mr. Egli possessed child pornography, which would

19  certainly be sexually explicit material.

20         Do you believe that there is any other step I need

21  to take or steps I need to take to establish the violation

22  for the supervision?

23         Mr. Steele?

24         MR. STEELE:  And I can't remember what was said at

25  the end of trial.  We may have addressed this, I don't

                                                           10

1    remember.

2             However, I think the Court could find based on

3    what you heard at trial as if it were a hearing for the

4    supervised release violation, you could find each of those

5    allegations to have been proven by -- it's not even clear

6    and convincing, is it?  It's...

7             THE COURT:  Beyond a reasonable doubt.

8             MR. STEELE:  Well, no, they wouldn't have to be

9    proven beyond a reasonable doubt.

10            THE COURT:  No.  But the jury's verdict of child

11   pornography certainly was beyond a reasonable doubt.

12            MR. STEELE:  And it encompassed at least the

13   findings on the last two.  The other would have to be --

14   Allegation 1 would have to be a finding by the Court that he

15   possessed a laptop.

16            THE COURT:  And do you believe that there was

17   sufficient evidence, Counsel, in the trial that he possessed

18   a laptop?

19            MS. DAIN:  Your Honor, I would submit to the Court

20   that there is evidence if that had been an evidentiary

21   hearing just on those allegations, that the government has

22   provided the Court enough to find the violation by a

23   preponderance of the evidence.

24            MR. STEELE:  Your Honor, I agree.  And the

25   language here is "found to be in possession."  It was his

                                                              11

1  father's laptop that he was found to be.  I believe that the

2  record would establish that.

3          THE COURT:  All right.  And with that, I'm going

4  to find that, indeed, the evidence has established that

5  Mr. Egli violated all three of the requirements set forth in

6  the supervision.

7          Okay.  Do you want to tell me what you think?

8  I've read your materials very carefully, and I think you're

9  asking for 120 months; am I right?

10         MR. STEELE:  120 plus 12 consecutive, so 132.

11         THE COURT:  Right.

12         MR. STEELE:  So half of what the government is

13 asking.

14         THE COURT:  Why don't you come here.  It's easier

15 to hear.

16         MR. STEELE:  Okay.  And the government has pointed

17 to my argument of why the guidelines should be considered to

18 be lower than they actually are, and so it makes it more

19 reasonable for the Court to choose 120, as being reflected

20 in the arguments about the child pornography guidelines

21 themselves.

22         But the interesting argument that government and

23 defendant have, it takes place in 3553(a)(2)(C), which is

24 specific deterrence.

25         THE COURT:  All right.

                                                            12

1          MR. STEELE:  And the government -- and so we're in

2     often-argued ground, but it's not clear what works and what

3     doesn't work necessarily.

4          Now, the government has argued that we need to

5     incapacitate him for community safety.  And certainly,

6     that's an effective method to make 100 percent sure that he

7     doesn't violate the law in this way.  It's -- or violate the

8     law as it's presumed he might by committing some kind of

9     hands-on offense.  He hasn't done that before.  I understand

10    what he's talked about.

11         I think that's going too far.  I think that's --

12    and particularly since I think, with specific deterrence

13    there are a couple of things:  Incarceration and

14    incapacitation, and how do you reduce risk going forward?

15         We've offered an explanation of how to reduce that

16    risk.  Now, it's not a foregone conclusion that we can do

17    that.  But we've had three experts look at this and one to

18    diagnose him.  And Dr. Connelly has done her whole work on

19    autism.  Dr. Dodgion is one of the people doing this

20    psychosexual work in the community a long, long time.  And

21    then Dr. Stringham, who has been treating sex offenders with

22    autism for an equally long period of time.  And they all say

23    that we can't use the sort of one-size-fits-all method.

24    That you can't rely on a group process, which is really

25    effective in some areas, but you can't rely on a group

                                                            13

1   process with a man who has a hard time reading other people,

2   understanding what other people are thinking, and taking

3   criticism as it should be taken.  I mean, this is his

4   disability.  That's what autism, in some respects, means,

5   that you need to have a well-trained therapist, trained in

6   working with an autistic person and an autistic person who

7   is a sex offender.  And if you can do that, you can get them

8   to understand these things, understand themselves in

9   relation to these things.

10          One of the interesting things that isn't in the

11  material is Mr. Egli, of course, wanted to review the two

12  evaluations, and I would only let that happen if our social

13  worker, Kristina Swickard, reviewed them with him.  Because,

14  you know, we're -- I always want her to tell me what they

15  really mean.

16          And Mr. Egli found that -- both he said and

17  Kristina Swickard said this was -- appeared to be a really

18  interesting moment for him, a good moment, and that he said,

19  Oh, I think I understand some of what you're saying.

20          I think he's amenable to this treatment whenever

21  he might get there, ten or 20 years.  I think he's

22  interested in the treatment, and I think it would be

23  effective.

24          I don't think he wants to be -- as much as he

25  makes up stories and thinks about things, I think he'd

                                                           14

1    rather be free.  I think he'd rather be productive.  He has

2    been married before.  He has had jobs before.  And all of

3    that is just way in his past now.  I mean, he's been locked

4    up a great deal.

5          So because we really don't know what the future

6    will bring, I think that the well-supported suggestion that

7    he should have a different kind of sex offender treatment --

8    at least one component should be different and that that

9    would lower his risk, which is what Dr. Dodgion says,

10   otherwise his risk remains high -- I agree with that.  He's

11   proven that over and over again.  He's going to look at CP.

12   But with this treatment, that may not be.

13         And so that's why I'm asking for the lower

14   sentence.  I think an 11-year sentence is a substantial

15   sentence any way you count it.  And let's get to the

16   treatment.  And let's see him in the community.  Now, the

17   other argument -- and that appears to be where we're

18   arguing:  How do we lower his risk to the community?  And so

19   I understand their argument, and I propose ours.

20         The other way to look at it is harder, and maybe

21   this is why it wasn't raised by the government.  But

22   3553(a)(2)(A), just punishment, the Court could impose

23   whatever sentence up to the stat max just because we've been

24   here too many times.  I'm not suggesting that's a good idea

25   or a good way to do sentencing.  But it's hard to gauge what

                                                              15

1    just punishment would be.

2         I don't think it would be effective punishment.  I

3    don't think overpunishing accomplishes things.  I think we

4    have -- as parents, we have a sense of that, that you reach

5    a point where you're not getting through, and if you have

6    something else to do, it's worth trying.

7         So that's what I have to say, Your Honor.  Do you

8    have any questions of me?

9         THE COURT:  I do not.

10        MR. STEELE:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Mr. Egli, is there anything you want to say, sir?

13   You certainly can.  You don't have to.  But if there's

14   anything in addition, please tell me.

15        DEFENDANT EGLI:  Yeah.

16        Your Honor, this is very difficult.  A lot of

17   this -- yes, we've been here a couple times, but a lot of

18   this is actually very new to me.  I had never considered

19   that I had autism.  I always -- probably like a lot of

20   people, I assumed autism was a very strong thing where you

21   had obvious disorders, you couldn't speak properly and

22   things of that nature -- what you see on TV.

23        It really wasn't until Mr. Steele suggested that I

24   get tested for autism that I had even considered the idea.

25   I said, Okay, sure, why not?  It turns out I do show a lot

16

1   of the symptoms of autism.  That was an eye-opener.  And it

2   does explain a lot.  Because as Mr. Steele said, I do have a

3   very difficult time reading other people.  I have a

4   difficult time understanding what is and isn't correct.

5          There will be times I'm trying to do everything

6   correctly, but due to my lack of understanding, I do

7   something wrong.

8          I don't want to do things wrong.  I want this to

9   be the last time I'm ever in this building.  I want to -- I

10  want to have a life.  But as Dr. Connelly has mentioned --

11  as the social worker has mentioned, I am learning as I go.

12  There have been eye-opener moments for me.  The prosecution

13  can talk about everything I did in the past.  Okay.  The

14  past is the past.  Let me discuss the present.  Let me

15  discuss the future.

16         At the present, I have come to a very different

17  point in my thinking.  I will not deny that I committed the

18  offenses of having the laptop and having the tower and

19  having pornography on those.  It's been proven.  There's no

20  point in arguing it.  But back then, I truly believed that

21  it was okay for me to have adult material.  It wasn't

22  harmful.  It was just something that I enjoyed.

23         With the help of the various people that

24  Mr. Steele has sent to me and with a lot of introspection

25  and a lot of talking with my religious counsel, specifically

17

1    the bishop of the branch in the ward -- or the branch

2    president of the branch where I am at right now in Davis --

3    I'm sorry.

4              THE COURT:  Would you like a glass of water?

5              DEFENDANT EGLI:  Thank you, no.  I have -- my

6    problem is not -- it's allergies.

7              THE COURT:  I understand.

8              DEFENDANT EGLI:  I was out of it this morning.  I

9    forgot to take my allergy medicine.  So I'm just doing the

10   best I can here.

11             THE COURT:  All right.  Please go ahead.

12             DEFENDANT EGLI:  In the last, literally, the last

13   about month, month and a half, I have really been examining

14   my life.  And I have come to a very simple conclusion.

15   There is only one safe level of adult material for me at

16   this time, and that is zero.  I can't say what the future is

17   going to hold.  Maybe some day I'll feel differently.  But

18   right now, as I stand at this podium, I don't want to go

19   back not just to the child porn, I don't want to go back to

20   any porn.  I want to be able to live my life so if at any

21   time there was ever a reason to search me, the search would

22   turn up negative -- not because things are hidden, but

23   because there's nothing to find in the first place.

24             I don't know how to say this because as I've said

25   to you before, I'm very -- very hard at expressing feelings

                                                          18

1    and emotions.  I have thoughts.  I know exactly how it

2    sounds in my head, but I cannot place the words to it.

3         I don't want to deal with this anymore.  I want to

4    just get this taken care of.  I want to eventually go home.

5    And I want to live a good, healthy life.  The treatment that

6    Dr. Connelly and everyone has recommended for me sounds like

7    it would be just the thing for me.  And I truly would

8    welcome it.  I'm not just -- it's not simply saying, you

9    know, I'm open to it.  I'm saying, If this will help, I'm

10   all for it.  Because I do have this difficult time of

11   understanding some things about why this is and why this

12   isn't.

13        I am learning as I go.  There are things that in

14   the past have not made sense to me that do now.  I guess as

15   an example, I was listening to the radio just a few days

16   ago.  And on the MSNBC news, there was a story about a

17   Christian pastor who had been abusing some of the teens he

18   was in charge of.  I had always heard that people were

19   retraumatized by thinking about it, by hearing about it.

20   That never made sense to me.  I couldn't see that.  But then

21   I heard from one of the victims.  I heard from a man who was

22   one of the people who was offended against.  And I heard him

23   breaking down in tears, saying it was very hard, because

24   when he talks about it or when he thinks about it, it's like

25   it's happening all over again.  Until that point, that had

19

1    never really clicked with me.

2              I have said many times I don't want to be the

3    cause of anybody's pain.  Quite the opposite.  I want to be

4    the cause of happiness.  I want to be the cause of joy.  And

5    I can better see now what I've done in the past and how that

6    that is done to others.  And I hate it.  I truly understand

7    and accept that I have caused pain to others.  In fact, I

8    hate that about myself.  But I can't lie.  I'd be deceiving

9    myself if I said it wasn't true.

10             I do believe that this treatment that Dr. Connelly

11   proposes and that others have proposed would be just the

12   thing for me.  It is something I look forward to.  I am

13   eager to get started on it.  And I just -- I wish I had more

14   to say.  I have so much in my head, but I truly do not

15   understand how to get it out.  I feel as, if you could see

16   into my head you would understand completely, but I know you

17   can't.

18             So all I can do is just make some simple promises.

19   Obviously, the BOP does not have treatment people who are

20   versed with autism and are familiar with treating sex

21   offenders with autism.  So it would not be valuable for me

22   to go through the BOP sex offender treatment program.  But

23   as soon as I'm out, I have a copy of the report from the

24   provider, who is doing this type of treatment.  And he says

25   in his report that he feels that his treatment would be a

1   very good fit for me.

2          I am perfectly -- not just happy but perfectly

3   anxious.  I want to call him and say, When can we start?

4   Because the last thing I want is to cause anybody pain.  And

5   I realize that I have.  And I realize that if I don't figure

6   out how better to relate to people, better to relate to the

7   world, that there is nothing to say conclusively it won't

8   happen again.  I realize that even with the treatment, we

9   cannot say conclusively.  But if you read everything, they

10  all say the same thing.  I have a very low risk of

11  reoffending, if given proper treatment.

12         The sooner I can be out of the prison system, the

13  sooner I can begin that treatment.  The sooner I can begin

14  it, the sooner I can end it properly, and the sooner

15  everybody will benefit from it -- not just myself but the

16  community as well.

17         Ms. Dain has talked about my desire to molest

18  children.  No.  Again, I can only speak about right now.

19  Right now, my only thoughts of children are in terms of what

20  kind of relationship I would have with them.  I just want to

21  be a good man.  I would like to eventually get married

22  again.  If I have children biologically, I would like to be

23  there for them so that they can come up to me and say, Dad,

24  I need your help.  Can you help me with this homework?  I

25  don't understand.  Can you help me put this together?

21

1          If it's just stepkids, that's fine, too.  But I

2     want the same thing.  I want any stepkids I may have to be

3     able to come up to me, know they're safe and say, Dan, I

4     need your help with this, or, Dan, could you explain this?

5     Or, Dan, what is this?

6          That is the complete extent of any thoughts of my

7     actions with children.  The idea of trying to go out and

8     have sex with someone who is underage, right now, it just

9     doesn't work for me.  And I believe it's because I am

10    learning.  It's because I am growing.  It is because I am

11    coming to a better understanding of what is what, what is

12    good, what isn't good.  Why do people do things?  Why do

13    they not do things?

14         I can't change my past.  I can't undo what I did

15    five minutes ago, let alone years ago.  But I can tell you

16    this:  However long it takes, when I get out, I'm not going

17    to have any problems.  I'm going to be the perfect straight

18    arrow.  I want my PO -- I'm going to tell my PO that I want

19    to be someone they don't worry about, that they can come in

20    and do the checks when they need to, that's fine.  I have

21    nothing to hide.  You're welcome to look around.  I want

22    them to leave knowing, not just simply saying, "satisfied,"

23    because that sounds bad.  That sounds like they think there

24    is nothing there but there something is.  I want them to

25    leave with the knowledge that there is nothing going on that

                                                            22

1  shouldn't, that I am just living my life and I am doing what

2  I'm supposed to do.

3       And that's my plan.  It has been for some time.  I

4  don't see that changing.  All I can do is just go forward

5  and say tomorrow is a new day.  Tomorrow I'm going to be

6  better than I was yesterday.  Thank you.

7       THE COURT:  All right.  Is there any reason that

8  sentence should not be imposed?

9       Mr. Egli, I would ask that you and Mr. Steele

10  remain at the podium.

11       And I've thought about a number of factors in

12  deciding what would be a reasonable sentence.  I thought

13  about the nature and circumstances of the offense.  And

14  possession of child pornography is a very serious offense.

15  I mean, it has such grave consequences for the victim

16  involved and for society.

17       And I've thought about the characteristics of

18  Mr. Egli.

19       Mr. Egli, I hope that you find the will to carry

20  out what you just told me.

21       But I have to be aware and I am aware that

22  Mr. Egli has a very long history involved with possession of

23  pornography and also just sexual crimes and actions, which

24  can be a danger to children.  That's a very serious offense.

25  And the law must take account of that.  And I have to make

23

1    sure that there is punishment given for that offense.

2           And I want to make sure, Mr. Egli, that you don't

3    continue in that behavior.  And I also have to protect the

4    public from any other crimes that you might commit or that

5    others who would also commit those kinds of crimes might be

6    inclined to engage in.

7           I would like you to receive educational and

8    perhaps medical care or correctional care to help you, to

9    help you get out of this way that you behave and have for so

10   many years.

11          And for those reasons, I'm going to sentence you

12   to a sentence of 234 months.  And when I break that down,

13   that is the total amount of custody.  That's 210 months for

14   the instant offense, the present offense, which the jury

15   found Mr. Egli had violated following four days of trial in

16   October, and also for the violation of supervision, which

17   really has been admitted to and the evidence at trial also

18   bore upon it.  And 210 months for the instant crime, 24

19   months to run concurrent to the 210 months -- consecutive,

20   excuse me, consecutive, absolutely consecutive.  Consecutive

21   to the 210 months.

22          I am also going to impose conditions and rules

23   that must be followed.

24          I imagine Mr. Steele, knowing how thorough you

25   are, that you went over the standard and mandatory special

                                                            24

1   conditions; am I correct?

2          MR. STEELE:  Yes, Your Honor.  And Mr. Egli had --

3   when he had questions, he asked them and asked for

4   follow-up.  So we had a good exchange.

5          THE COURT:  All right.  You will be placed on

6   supervision for your lifetime.  Within 72 hours of release

7   from custody of the Federal Bureau of Prisons, you must

8   report in person to the probation office in the district

9   where you're released.

10         There are no questions, or is there a question of

11  drug usage, Ms. Dain?  Mr. Steele?

12         MS. DAIN:  I don't believe that is an issue in

13  this case, Your Honor.

14         THE COURT:  Ms. Lingel, any drug issues?

15         THE PROBATION OFFICER:  No, Your Honor, not that I

16  have seen.

17         THE COURT:  All right.  Then I am going to suspend

18  the drug test within 15 days of placement on supervision.

19         But you must give a DNA sample.  Have you already

20  given a DNA sample?

21         DEFENDANT EGLI:  I have, Your Honor.

22         THE COURT:  All right.  Then that need not be

23  repeated, either.

24         Pursuant to the Adam Walsh Child Protection and

25  Safety Act of 2006, you must report the address where you

                                                    25

1   reside and any subsequent change of residence to the

2   probation officer responsible for supervision.  And you must

3   register as a sex offender in any state where you reside,

4   where you carry on a vocation, or where you are a student.

5           Do not commit any federal, state, or local crime.

6   And as a convicted felon, you are prohibited from possessing

7   a firearm or ammunition.  And do not illegally possess a

8   controlled substance.

9           You must comply with these special conditions.

10          The presentence report may be released to the

11  state sex offender registration agency, if required, for

12  purposes of sex offender registration.

13          You must participate in and successfully complete

14  sex offender treatment, to include a risk assessment at a

15  program approved by the U.S. Probation Office.  You must

16  abide by the rules, requirements, conditions, policies, and

17  procedures of the program.

18          You must submit to periodic polygraph testing as

19  directed by the probation office or treatment provider to

20  ensure your compliance with the requirements of your

21  supervision or treatment program.

22          And you must allow reciprocal release of

23  information between the probation office and the treatment

24  provider.  And you are responsible for all costs of your

25  treatment and related services.

26

1             I have already ordered that you must submit to

2     periodic polygraph testing as directed by the probation

3     office.  And this condition will apply, even after the

4     completion of any treatment you undergo.

5             You are restricted from contact with individuals

6     who are under 18 years of age without adult supervision, as

7     preapproved by the probation office.

8             You must not view, access, or possess any

9     materials depicting sexually explicit conduct as defined by

10    law if the materials taken as a whole are primarily designed

11    to arouse sexual desires.

12            You will not engage in any employment that may

13    reasonably be expected to bring you into contact with

14    individuals who are under 18 years of age without the

15    advance approval of the probation office.

16            I have determined that you are a risk to your

17    employer, prospective employer, or their staff, based on

18    your current offense and your criminal history.  Therefore,

19    you must notify any employer or prospective employer of your

20    current conviction and supervision status.  Your probation

21    officer may contact your employer or prospective employer to

22    confirm they are aware of the potential risk that you pose.

23            You must cooperate with the United States

24    Probation and Pretrial Services Computer and Internet

25    Monitoring Program, Appendix C.  This program will include

27

1  but is not limited to identifying computer systems as

2  identified in 18 U.S.C. § 1030(e)(1), internet capable

3  devices, networks, routers, modems and/or similar electronic

4  devices such as hard drives, external hard drives, flash

5  drives and the like, to which you have access.  All such

6  devices are subject to random inspection, search,

7  configuration, and the installation of monitoring software

8  and/or hardware at your expense.

9       You must inform all parties who access approved

10  computers or similar electronic devices that the devices are

11  subject to search and monitoring.  And you may be limited to

12  possessing only one personal computer and/or internet

13  capable device to facilitate the ability to effectively

14  monitor your internet-related activities.

15       You must report any and all electronic

16  communications service accounts, as defined in 18 U.S.C.

17  § 2510(15)(17), used for user communications, dissemination,

18  and/or storage of digital media files, such as audio, video,

19  images, documents, or device backups, to the U.S. Probation

20  Office.  This includes but is not limited to email accounts,

21  social media accounts, and cloud storage accounts.  You will

22  provide each account identifier and password and must report

23  the creation of new accounts.  Changes in identifiers,

24  and/or passwords, transfer, suspension, and/or deletion of

25  any account will be reported within five days of such

28

1    action.  You must permit the U.S. Probation Office to have

2    access and search any such accounts.

3         I have determined, as I previously stated, that

4    you pose a risk to other persons, specifically minors under

5    the age of 18.  If there is a time in which you may come in

6    direct contact with minors under the age of 18, you are

7    required to notify parents, guardians, employers, and/or

8    other responsible parties of the risk you pose.  And the

9    probation officer may contact the appropriate parties to

10   confirm that they are aware of the potential risk you pose.

11        You must submit your person; property; house;

12   residence; office; vehicle; papers; computer, as defined by

13   law in 18 U.S.C. § 1030(e)(1); other electronic

14   communications or data storage devices or media to a search

15   conducted by the probation office at a reasonable time in a

16   reasonable manner, based upon reasonable suspicion of

17   contraband or evidence of a violation of a condition of

18   release.

19        Failure to submit to a search may be grounds for

20   revocation.  And you must warn any other residents that the

21   premises are subject to searches pursuant to this condition.

22        I've considered your financial resources and

23   assets, projected earnings, other income, any financial

24   obligations, and I believe that you do not have the ability

25   to pay a fine, and I'm going to waive it.

29

1          But -- and I don't think there's any amount of
2    restitution.

3          Are you aware of any restitution amount, Ms. Dain?

4          MS. DAIN:  I am not, Your Honor.

5          MR. STEELE:  No, Your Honor.

6          THE COURT:  All right.  But you must pay a special
7    assessment fee of $100.

8          If you are going to file a notice of appeal --
9    Mr. Steele, I believe you would help Mr. Egli in so doing?

10         MR. STEELE:  Your Honor, and this is because of
11   the nature of our relationship at trial and likely on
12   appeal, I'd ask the Court to file the Notice of Appeal for
13   him.

14         THE COURT:  All right.

15         MR. STEELE:  I will introduce him to appellate
16   people that can explain to him what's going to happen.  But
17   that would be easier and a little more informative.

18         THE COURT:  All right.  Ms. Lingel, if you would
19   make sure -- and Ms. Dain, as well, make sure that if a
20   notice of appeal -- if Mr. Egli wishes to appeal, that he
21   does so within, what is it, 14 days?

22         MR. STEELE:  He'd assert that he would like that
23   notice filed.

24         THE COURT:  All right.

25         DEFENDANT EGLI:  Yes, Your Honor.

1            THE COURT:  And I will make sure.  And I know

2      Ms. Lingel will, as well, make sure that a notice is filed.

3            MR. STEELE:  Thank you, Your Honor.

4            THE COURT:  Is there anything else that I need to

5      do?

6        (Pause in the proceedings.)

7            THE COURT:  Anything else that I need to do?

8            MR. STEELE:  Your Honor, if I might have just a

9      moment.

10           THE COURT:  Absolutely.  Take all the time you

11      need.

12           MR. STEELE:  Thank you, Your Honor.  The -- I have

13      one question, probably an objection.  I understand the use

14      of polygraphs in sex offender treatment.

15           THE COURT:  Right.

16           MR. STEELE:  And have no problem with that.

17      They're not used to prosecute people, they're used to treat.

18           THE COURT:  Right.

19           MR. STEELE:  I've never had an experience with the

20      polygraph being used after treatment, and I'm assuming that

21      would be with probation applying the polygraph.  I've never

22      had experience with that and would object to that.

23           THE COURT:  All right.

24           MR. STEELE:  To the extent I understand that.

25           THE COURT:  Ms. Lingel, do you believe that is a

                                                              31

1  requirement that we should keep -- I should keep?

2          THE PROBATION OFFICER:  Your Honor, I actually --

3  I believe having the polygraph condition during treatment is

4  appropriate.  I'll be honest, I believe my supervisor

5  included that portion at the end there, and she didn't

6  follow up with me on that.  If there's any issue with that,

7  it can be addressed down the road when he's released.

8          THE COURT:  All right.  Then I'm going to modify

9  that once --

10         MS. DAIN:  Your Honor?

11         THE COURT:  Yes.

12         MS. DAIN:  My understanding, having had the same

13  objection on a number of occasions, is -- from probation is

14  that there are oftentimes that they utilize -- not often.

15  It is not often, I should say, that they utilize a polygraph

16  in the probation setting, not the treatment setting, to

17  determine the truthfulness of the probationers.  It is not a

18  fact finding or seeking.  It is a matter of determining

19  whether the probationers are being truthful with what

20  they're telling their probation officer.  So it has been

21  used in the past in that capacity.

22         And I think there is a history particular to this

23  defendant, where it would be justified because he has

24  frequently lied to probation previously.  So in this

25  instance, as to this defendant and based on how they've

                                                        32

1    utilized the polygraph in the probation setting, I think it

2    is appropriate.

3              THE PROBATION OFFICER:  And Your Honor, I am

4    following up with our sex offender unit supervisor.

5              THE COURT:  Okay.  We're not talking about

6    probation, we're talking about on supervised --

7              THE PROBATION OFFICER:  On supervised release.

8              THE COURT:  -- whether Mr. Egli will be subject to

9    polygraph testing.

10             I'm going to leave that.  However, if you wish to

11   challenge it, you certainly can.

12             MR. STEELE:  Your Honor, I would leave my

13   objection in place, and that may be part of any appeal.

14             THE COURT:  All right.  Anything else I need to

15   take up?

16             MR. STEELE:  A couple of requests.

17             THE COURT:  Please do.  Oh, yes.  And I want to

18   know what facility.

19             MR. STEELE:  He would request Englewood as being

20   the closest.

21             THE COURT:  Englewood?

22             MR. STEELE:  Colorado.

23             THE COURT:  All right.

24             MR. STEELE:  He's appropriate to be designated

25   there.  And there is treatment.  There is psychological

                                                              33

1   treatment there.  There are at least therapists.  He

2   completed sex offender treatment there as well.  Whether he

3   would do it again is certainly up to him, and that may not

4   be what he does.  So that would be why, for treatment and

5   for family visitation.

6          And the other thing is I'd ask that we attach to

7   the PSR the Dr. Connelly eval, Dr. Dodgion risk assessment,

8   and Dr. Stringham's letter for ongoing treatment once

9   released.

10         THE COURT:  The PSR, if I am correct, will travel

11  with Mr. Egli to whatever facility he is housed in; is that

12  correct, Probation?

13         THE PROBATION OFFICER:  Yes, Your Honor, that is

14  correct.  And I did attach the psychological evaluation and

15  the psychosexual evaluation.  I don't believe I received the

16  letter.  So if Mr. Steele could send that to me, I can

17  ensure it is attached.

18         THE COURT:  If you would.

19         MR. STEELE:  I will, Your Honor.

20         THE COURT:  All right.  What else?  What other

21  housekeeping matters or designation matters can I take up?

22         MR. STEELE:  Mr. Egli has a concern, and it's a

23  valid concern.

24         THE COURT:  All right.

25         MR. STEELE:  That he remain here at least to start

                                                          34

1    his appeal, but throughout the appellate process would be

2    his request.  I've told him we're in a bed crisis here and

3    that the likelihood of that is small.

4             But I will also tell the Court that the last time

5    we did one of these standby counsel roles, my client got

6    moved from ADC to Pahrump right when he had to designate the

7    record on his appeal.  And, of course, they take all of your

8    material, and you land in Pahrump with nothing.  And he

9    wasn't able to meet that deadline.  Now, we met it for him,

10   which caused a little bit of consternation.  But it's

11   difficult out there to do an appeal with all the movement

12   that happens.

13            So his request is that he remain here at Davis

14   County, I would say at least through the -- what do they

15   call it?  I'm not sure what they call it.  Oh, perfecting of

16   the appeal.

17            THE COURT:  I'm going to have to leave that with

18   the Marshals Service at the discretion of the Marshals

19   Service.

20            MR. STEELE:  I appreciate that, Your Honor.

21            THE COURT:  Anything else, Probation, that I need

22   to take up?

23            THE PROBATION OFFICER:  I might have missed it,

24   Your Honor, I just want to clarify:  Did you order that the

25   supervision violation case be closed upon the completion of

35

 1  the 24-month sentence?

 2          THE COURT:  Right.

 3          THE PROBATION OFFICER:  There'll be no

 4  supervision.

 5          THE COURT:  He has, in effect, been found to have

 6  violated those three allegations.

 7          THE PROBATION OFFICER:  And so when he completes

 8  the 24 months on that case, it will be closed at that point,

 9  however they determine when that --

10          THE COURT:  Yes.

11          THE PROBATION OFFICER:  Okay.  Thank you.

12          MR. STEELE:  Nothing further, Your Honor.

13          THE COURT:  All right.  We'll be in recess.

14          DEFENDANT EGLI:  Your Honor, if I may?

15          THE COURT:  Surely.

16          DEFENDANT EGLI:  I just have one other request.  I

17  know you can't make the actual placements.  I know you can

18  only make recommendations.  But if you would, please make a

19  recommendation to the marshals that I not go to Pahrump.  I

20  am just not comfortable there.  They've changed things.  And

21  instead of it being a nice safe environment now, I would be

22  surrounded by other people who I can't isolate myself from,

23  and that is going to be extremely difficult for me.  So if

24  you could just recommend to them that I stay here until they

25  are ready to transport me to the actual prison.

                                                        36

1          THE COURT:  All right.  Again, and I understand;

2     however, placement of where you are, now that I have

3     finished my sentencing is pretty much at the discretion of

4     the marshals.

5          DEFENDANT EGLI:  I understand.  I only ask that

6     you just enter a recommendation into the record.  That's

7     all.

8          THE COURT:  It's in the record by reason of your

9     having made it now.

10          DEFENDANT EGLI:  Thank you, Your Honor.

11          THE COURT:  Okay.  We'll be in recess.

12     (The matter concluded at 2:32 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

37

1                    COURT REPORTER'S CERTIFICATE

2

3   State of Utah          )
                           ss.
4   County of Salt Lake    )

5              I, Michelle Mallonee, a Registered Professional
    Reporter in and for the State of Utah, do hereby certify:
6
               That the proceedings of said matter was
7   reported by me in stenotype and thereafter transcribed into
    typewritten form;
8
               That the same constitutes a true and correct
9   transcription of said proceedings so taken and transcribed;

10             I further certify that I am not of kin or
    otherwise associated with any of the parties of said cause
11  of action, and that I am not interested in the event
    thereof.
12
               WITNESS MY HAND at Salt Lake City, Utah, this
13  8th day of September 2025.

14

15

16                           *Michelle Mallonee*

17             _____
               Michelle Mallonee, RPR, CCR
18             Utah CCR #267114-7801
               Expires May 31, 2026
19

20

21

22

23

24

25
                                                              38